638 A.2d 839

KALI BARI TEMPLE AND BIRENDA NATH GANGULY, PLAIN-
TIFFS–APPELLANTS, v. BOARD OF ADJUSTMENT OF THE
TOWNSHIP OF READINGTON, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 20, 1994—Decided March 2, 1994.

*Albert Cohn* argued the cause for appellants (*Cohn, Lifland, Pearlman, Herrman & Knopf.* attorneys; *Terri Del Greco,* of counsel, and *Allen Susser,* on the brief).

*Donald K. Moore* argued the cause for respondent (*Kelleher & Moore,* attorneys; Mr. *Moore,* of counsel and on the brief).

Before Judges SHEBELL, LONG and LANDAU.

The opinion of the court was delivered by

LANDAU, J.A.D.

Plaintiffs Birenda Nath Ganguly (Ganguly) and the Kali Bari Temple (Temple) appeal from a Law Division judgment affirming the denial of their application for a dual use variance under *N.J.S.A.* 40:55D–70d, a bulk variance under *N.J.S.A.* 40:55D–70c and certain site plan approvals by defendant-respondent Board of Adjustment of Readington Township (Board).

I

Ganguly is a Hindu clergyman. In 1989, he purchased a house on Stanton Road in Readington, located in its RR residential zone. On his attorney's advice, title to the property was taken in the names of Ganguly and the Kali Bari Temple, a tax-exempt non-profit religious organization. The property is located on 7.24 acres bordering a long blind curve on Stanton Road. The RR residential zone permits single family residences as of right, but allows religious-institution use only upon grant of special exception by the Board. *Readington, Zoning Ordinance,* §§ 2.1.1 to 2.1.2. The general provisions of the Township's Zoning Ordinance also prohibit "[c]ombined residential and other use of a building, except where specifically permitted." *Readington, Zoning Ordinance,* § 7.9.

As a spiritual leader in the Hindu religion, Ganguly wishes to hold religious services in a portion of his home. To that end, he converted his family room into a temple where he and other followers of his religion can worship. The room, which contains 574 square feet, has its own outside doorway. Ganguly's plans call for no alterations to the exterior, save for modifying the entrance doorway to the temple room with a "temple shape" arch.

Religious services are ordinarily held only by appointment, and range from one to two hours in length. Typically, only one family at a time prays together with the religious leader, who offers a message of inspiration. Ganguly makes himself available to his small congregation at all hours, except during afternoons when he has secular employment. The congregation presently numbers

fifteen to twenty, and Ganguly says there is no plan to increase its size.

In addition to the above services, six major Hindu religious holidays require formal religious services on dates determined by the Indian calendar. During one holiday, the worshipers attend the Temple between ten a.m. and noon for three consecutive days. A small bell is rung during prayers but cannot be heard outside the house. At any given time during the two hour holiday prayer sessions, there are between fifteen and twenty people in attendance. Ganguly is also authorized to perform marriage ceremonies, which might be attended by as many as thirty or forty people.

Plaintiffs sought a variance to sanction use of the family room for temple purposes, while retaining residence use for the remainder of the house. Because of this use application, plaintiffs also asked for relief from small deficiencies in bulk requirements for which the property would enjoy non-conforming status but for the proposed use modification. The ordinance requires a minimum lot circle of 250 feet and a 40 foot setback. Plaintiffs' house presents a 230 foot lot circle and 36.49 foot set back. The site plan approval request was to cover any alterations which might be required by the Board.

To alleviate concerns of the Board that the congregation's size could not be controlled once variances were granted, plaintiffs were willing to limit size of the congregation to the fire code capacity of the Temple room.

Ganguly expressed willingness to comply with other conditions which might be imposed by the Board. Conditions discussed by the Board included ramping the Temple room for handicapped-accessibility and enlarging the width of the driveway to fourteen feet. The present driveway can accommodate nine parked cars, although the site has room for thirty to forty vehicles without blocking access and egress in an emergency situation. In response to the Board's concern that vehicles must be able to exit the driveway during an emergency, plaintiffs said they were

willing to put additional parking spaces anywhere on the property designated by the Board.

The Board's Resolution rejected plaintiffs' application upon the following findings:

1. The primary nature of the within application is that of a use variance converting a residential structure into a dual use residence with religious services. As such, the use in question is not recognized by either the zoning ordinance or the master plan of Readington Township.

2. Since the use is dual in nature and primarily one of a residence, it cannot be classified as inherently beneficial. Given this situation, there was no showing that this particular dual use was particularly fitted to the property in question. On the contrary, it appeared that the dual use would be a much more intense use injected in the middle of an otherwise tranquil residential area. In fact, the location itself seemed to be inadequate for the religious portion of the use since it was located on a bend in a residential road wherein numerous traffic accidents had taken place.

3. In terms of the negative criteria, the dual use proposed would in fact substantially impair the intent and purpose of the zoning ordinance and the master plan since it was not recognized anywhere in both the zoning ordinance and master plan as permitted. Unlike other churches located in the area with substantial following, the proposal was dominated by the residential quality of the use proposed, making the church usage ancillary.

4. In terms of the substantial impairment of the public good, other than net evidence produced by a witness unqualified relative to property values, there was no evidence produced whatsoever which would support the conclusion that the proposed use would not have a substantial impact on the values of surrounding properties nor on the quality and nature of the usage of the surrounding residential area.

5. In addition, the use proposed did not appear to be consistent with the zoning ordinance or with the master plan, and hence did not meet the requirements of the Medici decision.

Considering these findings upon the *R.* 4:69 review, the trial judge determined that it was unnecessary to address the positive criteria of *N.J.S.A.* 40:55D–70d. The judge concluded that plaintiffs had not satisfied the negative criteria burden to demonstrate that granting the variances would not substantially impair the public good or the intent and purpose of the Zoning Plan and Zoning Ordinance, and accordingly affirmed the variance denial. We reverse.

## II

Plaintiffs argue that the evidence presented at the municipal level hearing satisfied both positive and negative criteria of *N.J.S.A.* 40:55D–70d, as interpreted by settled case law, and that denial of their variance applications was arbitrary and capricious.[1]

■ The standards for granting a use variance are set forth in *N.J.S.A.* 40:55D–70d:

> d. In particular cases and for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) . . ., (3) deviation from a specification or standard pursuant to section 54 of P.L.1975, c. 291 (C. 40:55D–67) pertaining solely to a conditional use, . . . A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act.

>      *      *      *      *      *      *      *      *

> No variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

Accordingly, an applicant must show that special reasons exist for the variance (positive criteria), and that the variance can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and zoning ordinance (negative criteria). *See Sica v. Board of Adjustment of Tp. of Wall,* 127 *N.J.* 152, 603 *A.*2d 30 (1992); *Medici v. BPR Co.,* 107 *N.J.* 1, 18–23, 526 *A.*2d 109 (1987).

■ In addressing the positive criteria, an applicant must establish that the proposed use is either "inherently beneficial" or that a demand for the use exists and that the use itself is particularly

---

[1] The contested issues involve only the *N.J.S.A.* 40:55D–70d variance application for dual religious-residence use. It is apparent that neither the Board nor the Law Division was concerned with the modest exterior modification of the family room doorway, nor with the minimal deviations from set back and "lot circle" requirements which preexisted the zoning ordinance.

fitted to the property in question. *See* Cox, *New Jersey Zoning and Land Use Administration,* §§ 7–2.1 to 7–2.2 (1993).

■ Where a proposed use is inherently beneficial, a balancing test must be employed to determine whether the proposed use complies with the negative criteria. *Sica, supra,* 127 *N.J.* at 165–66, 603 *A.*2d 30. A board must first identify the public interest at stake in the proposed use, then identify any detrimental effect which would ensue were the variance to be granted. *Id.* The board should then determine whether the detrimental effects can be reduced by imposing reasonable conditions on the use. *Id.* at 166, 603 *A.*2d 30. Finally, the board "should weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Id.*

As the Supreme Court has observed, courts generally answer the question whether a proposed use is inherently beneficial by distinguishing between commercial and non-commercial uses. *Sica, supra,* 127 *N.J.* at 159, 603 *A.*2d 30. It has been held that a church use is inherently beneficial. *See Holy Spirit Ass'n for Unification v. Rosenfeld,* 91 *A.D.*2d 190, 458 *N.Y.S.*2d 920, 925–26 (1983) *appeal denied,* 63 *N.Y.*2d 603, 480 *N.Y.S.*2d 1025, 469 *N.E.*2d 103 (1984); *State v. Cameron,* 184 *N.J.Super.* 66, 75, 445 *A.*2d 75 (Law Div.1982), *aff'd,* 189 *N.J.Super.* 404, 460 *A.*2d 191 (App.Div.1983), *rev'd on other grounds,* 100 *N.J.* 586, 498 *A.*2d 1217 (1985). A religious use is "clearly in furtherance of the public morals and general welfare." *See* 2 Rathkopf, *The Law of Zoning & Planning,* 4th ed., § 20.01[3][a], at 20–9.

■ Conduct of religious services in a residence does not alter the "inherently beneficial" determination. In fact, a church and its rectory or parish residence have been generally considered to be an integral unit. *See* 2 Rathkopf, *The Law of Zoning & Planning,* 4th ed., § 20.01[3], at 20–8. From a zoning perspective, we do not perceive any diminution in benefit created because people worship in a structure occupied as a residence by their clergyman.

■ The Board here characterized the plaintiffs' church usage as merely "ancillary"[2] to a dominant residential use. It distinguished the application from "other churches located in the area with substantial following" in which church usage presumably dominated the dual residence-religious uses shown presently to exist in Readington. We view this "ancillary" characterization as a tacit recognition of the truly limited negative zoning impact to be expected from this proposal, particularly if protective conditions, as invited by plaintiffs, were to be imposed. *See Sica, supra,* 127 *N.J.* at 166, 603 *A.2d* 30. As to the positive criteria issue, we decline to endorse reasoning which recognizes the benefits of dual-use zoning treatment for churches with substantial followings, while rejecting far more limited dual usage by a small religious group which does not swim in the locally recognized mainstream. *See Braunfeld v. Brown,* 366 *U.S.* 599, 603–04, 81 *S.Ct.* 1144, 1146, 6 *L.Ed.2d* 563, 566–67 (1961).

In *Cameron, supra,* Justice Clifford, concurring, said:

[T]he Supreme Court echoed Justice Douglas's observation that "[w]e are a religious people whose institutions presuppose a Supreme Being." The Court reminded us of the rich diversity of our religious beliefs, and that by accommodating all forms of religious expression, "governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people'"

[*Cameron, supra,* 100 *N.J.* at 609, 498 *A.2d* 1217 (Clifford, J., concurring) (quoting *Lynch v. Donnelly,* 465 *U.S.* 668, 104 *S.Ct.* 1355, 79 *L.Ed.2d* 604 (1984)) ].

Kali Bari Temple would be the only Hindu place of worship in Hunterdon County. We find that plaintiffs' proposed ancillary religious use of this residential property easily satisfies the positive criteria of *N.J.S.A.* 40:55D–70d.

■ This holding does not implicate the Establishment Clause of the First Amendment of the United States Constitution. Rath-

---

[2] The finding of merely ancillary use may become relevant should local property tax exemption issues surface in another forum at another time. Although local taxing entities must be vigilant to avoid improper use of religious trappings to evade taxes, an authentic church use cannot be denied for tax revenue reasons.

er, it avoids possible conflict with rights of free exercise, given Readington's receptivity to larger churches in its residential zone. *See Abington School District v. Schempp,* 374 *U.S.* 203, 247, 83 *S.Ct.* 1560, 1585, 10 *L.Ed.*2d 844, 873 (1963) (Brennan, J., concurring) ("the logical interrelationship between the Establishment and Free Exercise Clauses may produce situations where an injunction against an apparent establishment must be withheld in order to avoid infringement of rights of free exercise."); Note, *Land Use and Free Exercise,* 84 *Colum.L.Rev.* 1562, 1583–85, n. 123 (1984) (arguing that protection of constitutional liberties is a valid secular purpose).

■ We turn to evaluation of the negative criteria under the balancing standards enunciated in *Sica, supra,* 127 *N.J.* at 166, 603 *A.*2d 30, for inherently beneficial uses. Not every detriment to the public good "will support the denial of a use variance. Only one that is 'substantial' will suffice". *Id.* at 163–165, 603 *A.*2d 30. The facts of each case must be considered.

■ Plaintiffs' application was denied upon general findings that the dual use would lower property values, increase traffic and noise in the area, and that it was not consistent with the residential zoning scheme of the area.

The record does not support those general conclusions under a substantial detriment standard. Plaintiffs' expert, a city planning engineer, testified that the values of the surrounding properties would not decrease if the dual use variance were granted because the exterior of the property would not change, unless the minor alterations discussed at the hearing were imposed by the board. These would include a handicap ramp and enlargement of the width of the driveway. Even with those changes, we do not find it reasonable to conclude that the residential character of the subject property or the neighborhood would thereby be altered to its substantial detriment.

It seems to us that the Board and the trial judge have inadequately considered the extremely limited amount and nature of

the proposed religious services. The small congregation does not worship together except for several holidays a year. Most worship is personalized in small family groups, and the volume of activity suggested by the arguments of the Board on appeal is simply unsupported by the record. Justice Clifford's words in *Cameron* are apt: "It [the congregation] therefore meets in the humble residence of its minister, traditionally a practice of new congregations. One should therefore erase from the mind any image of . . . plopping down Canterbury Cathedral in the middle of bucolic Somerset County . . . [w]e are talking about a few folks gathering at someone's home." *Cameron, supra,* 100 *N.J.* at 604, 498 *A.*2d 1217 (Clifford, J., concurring).

Moreover, as we observed in the discussion of positive criteria, neither the trial judge nor the Board has explained, nor can we discern, why using the property primarily as a residence with an ancillary church would impair the intent of the zoning ordinance while a structure which serves primarily as a church and secondarily as a residence would not.

To the extent that there are concerns about excessive activity, noise, traffic, parking or other legitimate zoning concerns, the Board and the Township have available the full range of police powers to impose conditions aimed at avoidance of detrimental effects. *See Sica, supra,* 127 *N.J.* at 165, 603 *A.*2d 30; *Cameron, supra,* 100 *N.J.* at 600, 607, 498 *A.*2d 1217. Such conditions were invited by plaintiffs. For example, occupancy of the temple room may be limited by reference to the fire code. *See e.g., Allendale Congregation of Jehovah's Witnesses v. Grosman,* 30 *N.J.* 273, 152 *A.*2d 569 (1959) *appeal dismissed,* 361 *U.S.* 536, 80 *S.Ct.* 587, 4 *L.Ed.*2d 538 (1960) (ordinance requiring church to provide one off street parking space for every three seats did not violate the freedom of assembly and worship clauses). In light of the infrequent presence of the entire congregation, and the expressed willingness to maintain limits on its size, the parking issue appears to be largely illusory.

Balancing the inherently beneficial religious use requested by plaintiffs against the potential for adverse impact on the neighborhood, when reduced by conditions that may be lawfully imposed by the Board and the Township under local ordinances, we hold that the requested variance should have been granted, and that it's rejection was arbitrary.

Although they have not been argued below or to this court, our conclusion also harmonizes with those opinions which have found that the constitutional guarantees of freedom of worship[3] foreclose unreasonable application of the zoning powers to prohibit free exercise of religious activity. *See Cameron, supra,* 100 *N.J.* at 602–03, 498 *A.2d* 1217 (Clifford, J., concurring) (township's zoning powers should not be used to "prevent residents from preaching, praying, singing hymns, and coming together in the name of their Lord in a private residential dwelling"); *Farhi v. Deal Bor. Comm'rs.,* 204 *N.J.Super.* 575, 499 *A.2d* 559 (Law Div.1985) (zoning ordinance which is enforced to prevent the gathering of religious worshipers in a private residence violates the free exercise of religion guaranty under our State's Constitution); *Burlington Assem. of God v. Zoning Bd.,* 238 *N.J.Super.* 634, 570 *A.2d* 495 (Law Div.1989) (zoning ordinance and board's refusal to grant variance to permit church to build a radio antenna tower on its property, violated church's right to religious freedom and freedom of speech). *See also Islamic Center of Miss. v. Starkville, Miss.,* 840 *F.2d* 293 (5th Cir.1988) (refusal to grant a permit to an Islamic Center to use a building for public worship services violated the free exercise of religion clause); *Jehovah's Witnesses Assembly Halls v. Jersey City,* 597 *F.Supp.* 972, 981–82

---

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const.* Amend I. Through the due process clause of the Fourteenth Amendment, the First Amendment has been made applicable to the states and local governments. *See Cantwell v. Connecticut,* 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1940). Similarly, the New Jersey Constitution provides, "No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience." *N.J. Const.* art. I, para. 3.

(D.N.J.1984) (awarding preliminary injunction against enforcement of Jersey City's zoning ordinance which would have prevented the conversion of a theater into a place where plaintiffs could practice, teach and proclaim their religious beliefs).[4]

The Law Division judgment affirming denial of the requested variance is reversed. We remand to the Board of Adjustment of the Township of Readington which shall grant the variance, subject however, to the Board's power to impose reasonable conditions consistent with recognized police power concerns.

Reversed and remanded.

---

[4] *Compare Messiah Baptist Church v. County of Jefferson, State of Colo.*, 859 F.2d 820 (10th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989) (upholding zoning provision which precluded construction of a structure designed to accommodate a place for worship, administrative offices, a school, and a parking area for 151 vehicles in an agricultural zone); *Grosz v. City of Miami Beach, Fla.*, 721 F.2d 729 (11th Cir.1983), *cert. denied,* 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984) (affirming the prosecution of a rabbi who conducted worship services in his home in violation of zoning laws); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303 (6th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (upholding a zoning provision applied to prohibit the construction of a church for a 175 member congregation on a residentially zoned lot). *But see Christian Gospel Church v. San Francisco*, 896 F.2d 1221 (9th Cir.) *cert. denied,* 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990) (zoning provision requiring conditional use permit for church in urban residential area did not violate the free exercise or equal protection clauses).