**CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, Douglas Bennett, Finley Eversole, Frieda Eversole & Barry Seidel**

v.

**JEFFERSON COUNTY, John Katopodis, Chris McNair, David Orange, Reuben Davis & Jim Gunter.**

**No. CV89–PT–0711–S.**

United States District Court, N.D. Alabama, S.D.

Feb. 7, 1990.

See also 721 F.Supp. 1212.

Donald H. Brockway, Jr., Douglas P. Corretti, Mary D. Hawkins, James R. Scalco, Corretti & Newsom, Birmingham, Ala., for plaintiffs.

Charles S. Wagner, Jeffrey Monroe Sewell, Asst. County Attys., Birmingham, Ala., for defendants.

PROPST, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings of Fact*

This cause came on to be heard at a bench trial. After considering the facts suggested by the parties, objections thereto, and the court's own copious notes, the court finds the following facts:

Plaintiff The Church of Jesus Christ of Latter–Day Saints ("LDS") entered into a contract to purchase from plaintiffs Finley Eversole and Freida S. Eversole ("the Eversoles") a parcel of real estate containing approximately eleven acres located at the northwest corner of Altadena Road and Cahaba River Road (Old U.S. Highway 280 —Florida Short Route) in an unincorporated area of Jefferson County, Alabama. Said tract of land adjoins a single family residential subdivision, and is relatively near U.S. Highway 280 (a four lane highway), and Interstate Highway I–459 and is approximately one-fourth mile from the Alabama State Offices of South Central Bell (Colonnade)[1] and the Colonnade commercial, office and retail development and,

---

1. When the County Commission rezoned the South Central Bell tract, across the Cahaba River Road from the "Eversole tract," it required a strip of residential zoning along Cahaba River Road and permitted no access from the South Central Bell property to Cahaba River Road.

along with the surrounding properties, is zoned E–1 (Estate District) by Jefferson County, Alabama. The eleven acre Eversole tract is a part of the Altadena residential estate neighborhood. The general character of the Altadena area is estate type residential usage from the intersection of Altadena Road with Cahaba River Road west for at least a distance of two miles. There is no commercial, industrial, or other public use of land immediately and contiguously adjacent to the subject property. It is completely surrounded by E–1 and single family residential use and zoning.

LDS and plaintiffs Barry W. Seidel and Douglas Bennett applied to defendant Jefferson County for a rezoning of the land from E–1 to Inst.–1 (Institutional District) so that the land could be developed and used as and for a place of worship for LDS and its members. The neighbors formed a group which opposed the rezoning. Their opposition was based on the fact that they were there first and had a right to rely on the E–1 zoning and did not want a church on the property because it could affect the appearance and value of their residences.[2]

The preponderance of the evidence is that LDS has suggested a plan, or would be willing to acquiesce in conditions, which would adequately satisfy all governmental site preparation concerns including traffic, sanitary waste disposal, storm water drainage, greenbelt and buffer zones, aesthetics and off street parking, lighting and signage. In any event, the zoning change was not denied on any premise related to site preparation or "state" concerns. LDS has indicated a willingness to exceed Inst.–1 criteria and standards. The property could be relatively shielded from surrounding residences by trees, etc. It is large enough to accommodate significant development.

The Planning Staff of Jefferson County recommended that LDS's zoning application was appropriate. The Planning Staff's recommendation was submitted to the Jefferson County Planning and Zoning Commission and, after a public hearing, the Planning and Zoning Commission unanimously recommended that the Jefferson County Commission rezone the land from its E–1 zoning classification to an Inst.–1 zoning classification.

The Jefferson County Commission, following a public hearing wherein there was vociferous opposition from the Altadena neighborhood, denied LDS's rezoning application by a vote of three to two. Commissioners John Katopodis and Jim Gunter voted in favor. Commissioner Katopodis knew of no reason that would justify denial. Commissioners David Orange, Reuben Davis, and Chris McNair voted against. Commissioner Orange made no inquiry of his staff nor did he compare the proposed development with the County's minimum Inst.–1 requirements prior to voting against the rezoning. Commissioner Orange did visit the site with J. Reese Johnston, a resident of the neighborhood who opposed the rezoning, and is also an attorney who is employed by Jefferson County as its lobbyist. Commissioner Davis did not know about the staff or the Planning and Zoning Commission recommendations at the time he voted on LDS's rezoning application. Commissioner Davis voted the "will of the people" regardless of other evidence and was swayed primarily, if not solely, by the voiced opposition. Commissioner Davis testified that until this case he didn't know that churches couldn't go anywhere. He further testified that he thinks churches should go anywhere "unless will of people oppose." Further, that if, the people don't want it, "the church shouldn't

---

**2.** All of the tracts adjacent to the Eversole tract are at least one acre, while most are larger. All are used for single-family residential estate usage. The residences near the subject property are exceptionally fine houses of *well* above average value. The purpose of the zoning rules and regulations is stated in the Jefferson County Zoning Resolution in pertinent part as follows: *These regulations are made with reasonable consideration,* among other things, *of the*

*character of each area and its peculiar suitability for particular uses,* and with a view to promoting desirable living conditions and the sustained stability of neighborhoods, protecting property against blight and depreciation, securing economy in governmental expenditures and conserving the value of land and buildings and structures. (Emphasis added).

want to be there." Commissioner McNair voted against the rezoning because the people opposing the rezoning were there first, and he believed their feelings should be given consideration. No Commissioner voted against the measure because of concerns about "state" factors, such as site preparation, etc.

If there had been no opposition, the rezoning request would likely have been approved. Implicit in the vote is that the "no" voters acquiesced in neighborhood concerns about having a church in their area which could, in the neighbors' judgment, affect the appearance of the area and the value of their properties.

Mr. O.C. Moon, the Jefferson County Land and Zoning Administrator, testified that his observation has been that most decisions on the application of churches for an Inst.–1 classification have been based on the degree of opposition. There is some inference that the degree of opposition is proportionate to the value of the surrounding residences.[3] The court reaches no conclusion as to the effect of this phenomenon on the "burden" on religion. Mr. Moon also suggested that the compatibility of churches with a neighborhood often depended on the feeling of the neighborhood.

Approximately six months prior to filing the subject rezoning application on the approximate eleven acre subject tract, LDS applied to rezone a tract of land containing approximately five acres located on the south side of Dolly Ridge Road, a short distance from the subject tract, from its E–1 zoning classification to the Inst.–1 zoning classification so that same could be used as and for a place of worship for LDS and its members. The Dolly Ridge site received an unfavorable recommendation by the Jefferson County Planning Staff and the Jefferson County Planning and Zoning Commission. Jefferson County denied rezoning of the Dolly Ridge tract with one of its Commissioners, David Orange, voting in favor of such rezoning. Commis-

sioners Katopodis, Davis, Gunter and McNair voted against it. Someone on the Commission suggested, after the Dolly Ridge rejection, that LDS come back with a larger tract located on the fringe of a single family residential development. The Eversoles, owners of the eleven acre tract involved in the instant case, were approached by plaintiffs Barry Seidel and the LDS Church after denial of the "Dolly Ridge Road" request. They entered into a contingent sales contract of the subject property to the church, conditioned on the existing E–1 zoning being changed to the Inst.–1 zoning classification to permit the construction of a church thereon. The Eversole property has been used continuously for residential estate purposes from at least the early 1940's to the present day. The Eversoles occupy the single family dwelling on the property. The present rezoning request was for a tract more than twice as large as the Dolly Ridge tract.[4] The denial of the subject request was not based on objective standards, but simply reflected a vote based on the "will of the people." If there had been no opposition, the rezoning would have likely been granted.

LDS has outgrown its present Church facility. The present Church facility does not satisfy the needs of LDS and it cannot be reasonably enlarged to do so. The individually named plaintiffs and all members of the First Ward of the LDS Church have continuously practiced their religious beliefs at their current location in Mountain Brook, Alabama, during the zoning application process and legal appeals which are still pending. LDS has, as a central tenet of its faith, the need to assemble together and strengthen the faith of each other and to partake of communion. Book of Mormon 43, Verse 8. LDS has as an integral part of its faith the need to gather under one roof to express its strength in unity and to gain strength to express its individual faith. Book of Mormon 59, Verse 9.

---

3. This conclusion is likely based more on speculation of the court than on the evidence.

4. The subject property cannot be said to be on the "fringe" of a residential development. It is large enough to provide a degree of isolation. The court does not find that the *plaintiffs* need a full eleven acres to build on.

LDS's ritual requires assembly to create a sense of community among its members and to communicate the Church's identity as a group devoted to a common ideal. The LDS ritual preserves, evidences and perpetuates its faith.[5] LDS has no church or place of worship in the unincorporated area of Jefferson County. The LDS Church and its members have no fundamental tenets or principal beliefs which *require* them to construct a place of worship on the eleven acre Eversole tract.[6] Within the First Ward of the LDS Church in Birmingham, lie the municipalities of Mountain Brook, Vestavia Hills, Homewood and Hoover. There is no evidence that any significant effort has been made to relocate the LDS Church in one of those municipalities.

In January 1985, Jefferson County rezoned a fifty-eight acre tract of land on Altadena Road which was originally zoned E–1, R–1 (Residential) and A–1 (Agricultural), for use by Briarwood Presbyterian Church as a place of worship, with a sanctuary containing 3,500 seats, and as a private school with classes from kindergarten through eighth grade. The Briarwood Church tract is adjacent and contiguous to single family detached residential subdivisions with E–1 zoning classifications. Briarwood Church is located exactly two miles from the LDS site on Altadena Road. There is presently an Inst.–1 zone (the prior site of the Briarwood Presbyterian Church) on Cahaba River Road within one-half mile of this site, which is adjacent to residential uses and which is presently owned and occupied by the Southeastern Bible College.

The Zoning Enabling Act of Jefferson County, Act No. 344, provides among other things in Section 1 thereof as follows:

Section 1. GRANT OF POWER.—For the purpose of promoting health, safety, morals, or the general welfare of the county, the governing body of any county having a population of 400,000 or more according to the 1940 or any succeeding Federal census (herein called the "county") is hereby empowered to regulate and restrict in the unincorporated portions of the county, except those areas within a municipal police jurisdiction subject to the authority of the municipal governing body as to powers similar to those vested by this Act in a county governing body, the use and construction of buildings, structures and land for trade, industry, and residence; and to establish setback lines for buildings and structures along the roads and streets.

Under the Jefferson County Zoning Resolution, churches are permitted uses only in Inst.–1 and PUD (Planned Unit Development) District R–7. The PUD R–7 Zoning Classification is a classification which permits mixed uses consisting of residential, commercial, and perhaps other uses on large tracts of land. Churches are not a permitted use in any of the residential zoning districts, commercial zoning districts or industrial zoning districts of Jefferson County. Theaters are permitted, but churches are excluded, in the C–1 (Commercial District).

In the geographical jurisdiction of the First Ward of the LDS Church, the Ward in which the subject site is located, there is no vacant and unimproved property not owned by a church zoned Inst.–1. In any event, there is none which provides a reasonable alternative to the plaintiffs. Of the 561,312 acres of land in the unincorporated area of Jefferson County, 1,190 acres are zoned Inst.–1. A minute portion of the land zoned Inst.–1 is vacant and not owned by a church. The permitted uses in an Inst.–1 zoning classification are:

a. Churches including all structures normal and incidental to such use.

b. Public elementary and high schools and private or parochial elementary and high schools having a curricula approximately the same as ordinarily given in public schools.

5. The court does not intend to suggest that it finds that the needs of LDS with regard to assembly of its members and communication among them is any greater than those of the usual church.

6. The defendant suggested this obvious finding. The court does not attach any significance to it. The eleven acre tract is obviously not some "Mt. Zion."

c. Public playgrounds and parks.

There is existing vacant and unimproved land in the unincorporated area of Jefferson County zoned for residential, commercial, and industrial uses and not for religious uses. There is no substantial evidence that there is any reasonably available property in Jefferson County for use by plaintiffs which is zoned Inst.–1.

The Inst.–1 zoning classification was adopted in 1977 and the R–7 zoning classification was thereafter adopted. When the Inst.–1 and R–7 zoning classifications were adopted, no property was classified either Inst.–1 or R–7. After the adoption of the Inst.–1 and R–7 zoning classifications, all new churches have been required to apply for rezoning. The Inst.–1 zoning classification was adopted to give the county better site development controls over institutional construction. Prior to the establishment of the Inst.–1 zoning classification, churches were permitted in residential areas, but the lack of control over site preparation, etc., created problems. The classification was created primarily to give such control. Under the Jefferson County Zoning Resolution, a church which selects vacant and unimproved property, not already zoned Inst.–1, to be developed and improved for religious uses, must, in every instance, seek rezoning from its existing zoning classification to Inst.–1 or R–7.

Zoning requests for churches have received the following action by the County Commission:

Three hundred five (305) approved as submitted; and,

Eight (8) approved with covenants; and,

Nine (9) denied. Two of the nine denials were the LDS applications.

Mr. House, an expert land planner, testified before the County Commission and before the court that the subject property was inappropriate for use as a sanctuary for the LDS Church because of the adverse effect it would have on the surrounding residential neighborhood. Mr. House testified that the principal reason that a church sanctuary on the Eversole property would be incompatible with the surrounding uses is that the Altadena Estate residential neighborhood was a strong and viable neighborhood, and that to allow the incursion of a non-residential use into this area could lead to the eventual deterioration and destruction of the residential estate neighborhood itself.[7] Mr. House agreed that neighborhood opposition is not an appropriate standard to determine "compatibility." Mr. House further felt that any rezoning to allow the building of this church would send a signal that other property in the area could be zoned other than E–1, and would adversely affect property values of the residential owners. Mr. House testified that the most appropriate use for the subject property was single-family residential, under the E–1 zoning classification.

None of the expert witnesses produced by the plaintiffs at trial testified before the Jefferson County Commission. Therefore, at the time that they made their decision, the County Commission did not have the direct benefit of any testimony offered at trial. The court cannot conclude that the construction of the church *would* or *would not* affect the appearance of the neighborhood or the value of the surrounding residences. The issue is significantly subjective.

There may be several other tracts of land zoned PUD, Agricultural, Commercial, Residential or Industrial, in Jefferson County which could be developed as and for church sites, provided they are appropriate for church usage and application for Inst.–1 zoning is made and approved. Of the nine Inst.–1 zoning applications denied by the Jefferson County Commission, there have been several "mainline" church applicants turned down, including both Baptist and Church of God. The court cannot find from a preponderance of the evidence that the neighborhood opposition or the Com-

7. There are a number of exceptionally fine, well above average residential areas in municipalities in Jefferson County which have churches near them. The court cannot find from a preponderance of the evidence that the values of these residences are adversely affected by the proximity of churches. There was substantial testimony that most churches in Jefferson County are in or near residential areas.

missioner's decisions were based on the denomination of the plaintiff church. The present system lends itself to unexpressed opposition of that type.

The plaintiffs filed for a land use variance to construct a church on the subject Eversole property on August 11, 1989, and said application for variance was denied by the Jefferson County Board of Zoning Adjustment on September 25, 1989, while this lawsuit was pending. The plaintiffs appealed that denial to the Circuit Court of Jefferson County on December 11, 1989, where their appeal is now pending and has been assigned case number CV89-7927 by the Circuit Clerk.

### Conclusions of Law

The court will rely primarily on the language in *Grosz v. City of Miami Beach, Fla.,* 721 F.2d 729 (11th Cir.1983) *cert. denied,* 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984) in arriving at a conclusion in this case. There, the court said, *inter alia,* that

> Before a court balances competing governmental and religious interest, the challenged government action must pass two threshold tests. The first test distinguishes government regulation of religious beliefs and opinions from restrictions affecting religious conduct. The government may never regulate religious beliefs; but, the Constitution does not prohibit absolutely government regulation of religious conduct.
>
> *       *       *       *       *       *
>
> The second threshold principle requires that a law have both a secular purpose and a secular effect to pass constitutional muster. First, a law may not have a sectarian purpose—governmental action violates the Constitution if it is based upon disagreement with religious tenets or practices, or if it is aimed at impeding religion. *Braunfeld v. Brown, supra,* 366 U.S. [599] at 607, 81 S.Ct. [1144] at 1148 [6 L.Ed.2d 563.] Second, a law violates the free exercise clause if the "essential effect" of the government action is to influence negatively the pursuit of religious activity or the expression of

religious belief. *Id.* This is not to say that any government actions significantly affecting religion fail this threshold test. Rather, any nonsecular effect, regardless of its significance, must be only an incident of the secular effect.

*Id.* at 733.

### B. Balancing

If a government action challenged under the free exercise clause survives passage through the belief/conduct and secular purpose and effect thresholds, the court then faces *the difficult task* of balancing government interest against the impugned religious interest. This constitutional balancing *is not a simple process.* We gain some sense of direction, however, from one basic principle: the balance depends upon the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity. This principle marks the path of least impairment of constitutional values. (Emphasis added).

> *       *       *       *       *       *

### The Burden on the Government.

—In general, the burden on the governmental interest depends upon the importance of the underlying policy interests and the degree of impairment of those interests if the regulation were changed to impose no burden on religious conduct. One principle that has emerged in free exercise doctrine, the "least restrictive means test," reflects the logic of our calculus. That is simply, if the government can effectuate its policy through a nonburdening technique the degree of impairment equals zero.

> *       *       *       *       *       *

Properly analyzed, therefore, the least restrictive means test constitutes just a special application of the general balancing test.

Free exercise doctrine suggests another step in implementing the government burden formula outlined above: we must consider the impact of a specific, religion-based exception upon government's poli-

cy objectives. In contrast to the clarity of the least restrictive means test, however, ambiguities pervade the standard for determining whether a religion based exception is constitutionally mandated.

*Id.* at 734.

Conflicting indications from *Sherbert* [*v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)] on one hand and *Braunfeld* and [*United States v.*] *Lee* [455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127] on the other leave open important questions as to when a religious exemption is mandated: How much weight should be given the potential for feigned religious claims for exemption? To what extent can a court consider administrative costs and inconvenience as opposed to necessary impairment of the primary policy goal? Generally, what degree of impact upon the government's broad policy goal should be tolerated before rejecting exceptions?

*The Burden on Religion.*—Having examined existing guidelines for measuring the burden on government, our journ· changes direction and we turn to the religious side of the calculus. The formula for calculating the burden on religion essentially parallels the formula used to figure the government's burden. The importance of the burdened practice within the particular religion's doctrines and the degree of interference caused by the government both figure into the calculus.

*Id.* at 735.

Only conduct flowing from religious belief merits free exercise protection; no weight measures on the side of religions unless the government action ultimately affects a religious practice. This latter determination is also difficult, but it is one that must be made in all free exercise challenges.

\*　\*　\*　\*　\*　\*

The Court further noted that to strike down legislation which imposes only indirect burdens would, absent the most critical scrutiny, "radically restrict the operating latitude of the legislature." *Id.* This distinction led to a conclusion that,

if the State regulates conduct by enacting a general law within its power, the purpose and effect which is to advance the State's secular goals, *the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden.*

*Id.* [81 S.Ct.] at 1148.

*Id.* at 736 (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605, 81 S.Ct. 1144, 1146–47, 6 L.Ed.2d 563). (Emphasis added)

It is especially unclear whether *Braunfeld* still creates presumptive validity for governmental actions that impose only indirect burdens. *No Supreme Court case since Braunfeld has relied on the direct/indirect rhetoric to uphold governmental action.*

One unifying principle for calculating the burden on religions remains intact, however. Governmental actions that burden religious conduct by focusing on the conduct itself, regardless of whether the action constitutes an imposition of a penalty or a denial of a benefit, impose heavy burdens on religion.

*The Final Balance.* In our examination of the methods by which burdens on government and religion are calculated two principles surfaced that merit repetition here. The first flows from the last restrictive means test. *When the government can as easily achieve its policy objective without burdening religious conduct, the burden on the government is zero and the scale necessarily reads against upholding the government action.* Similarly, the second principle operates when the burden on religion is zero. When the burden imposed by the government rests on conduct rooted only in secular philosophy or personal preference, the scale always reads in favor of upholding the government action. Similarly, the second principle operates when the burden on religion is zero. When the burden imposed by the government rests on conduct rooted only in secular philosophy or personal

preference, the scale always reads in favor of upholding the government action. *Id.* at 737. (Emphasis added).

*Thresholds.*

In this case, the thresholds pass quickly beneath our feet. The City's zoning law affects prayer and religious services, and so involves conduct. Therefore, balancing not absolutism is appropriate. That the law has both secular purpose and effect is noncontroversial. No one contends that zoning laws are based upon disagreement with religious tenets or are aimed at impeding religion. Similarly, given zoning's historical function in protecting public health and welfare, *see Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and the incidental nature of the asserted burden on religion, the essential effect of zoning laws is clearly secular.

*The Burden on Government*

The City of Miami Beach asserts a governmental interest in enforcing its zoning laws so as to preserve the residential quality of its RS–4 zones. *By so doing the City protects the zones' inhabitants from problems of traffic, noise and litter, avoids spot zoning, and preserves a coherent land use zoning plan.* The Supreme Court has acknowledged the importance of zoning objectives, stating that segregation of residential from non-residential neighborhoods "will increase the safety and security of home life, greatly tend to prevent street accident, especially to children by reducing traffic and resulting confusion, ... decrease noise ... [and] preserve a more favorable environment in which to raise children." (Emphasis added).

\* \* \* \* \* \*

The City asserts a significant governmental objective in the case at bar. Gatherings for organized religious services produce, as do other substantial gatherings of people, crowds, noise and disturbance. In fact, the parties' stipulations reveal that the City was acting pursuant to neighbors' complaints to end the disturbance caused by Appellees' conduct. Given this total inconsistency between the accomplishment of the City's policy objectives and the continuance of Appellees' conduct, the government action in this case easily passes the least restrictive means test.

Doctrine also requires that we consider the impact of a religious based exemption to zoning enforcement. In that regard *we find that granting an exception would defeat City zoning policy in all neighborhoods where that exception was asserted.* Maintenance of the residential quality of a neighborhood requires zoning law enforcement whenever that quality is threatened. Moreover, no principled way exists to limit an exception's cost just to the harm it would create in this case. Crowds of 500 would be as permissible as crowds of 50. Problems of administering the exception such as distinguishing valid religious claims from feigned ones, therefore, need not even be considered. A religious based exception would clearly and substantially impair the City's policy objectives. Together, the important objectives underlying zoning and the degree of infringement of those objectives caused by allowing the religious conduct to continue place a heavy weight on the government's side of the balancing scale.

*The Burden on Religion*

In calculating the burden on religion, we first determine whether the conduct interfered with constitutes religious practice. The religion of Appellee, Naftali Grosz, requires him to conduct religious services twice daily in the company of at least ten adult males. (Emphasis added).

\* \* \* \* \* \*

We assume therefore, that the nonessential practices further the religious conduct. *We must also assume, then, that Appellees suffer some degree of burden on their free exercise rights.* Turning to the significance of that burden, we note that Miami Beach does not prohibit religious conduct per se. Rather, the City prohibits acts in furtherance of this conduct in certain geographical areas. (Emphasis added).

\* \* \* \* \* \*

*The City's zoning regulations permit organized, publicly attended religious activities in all zoning districts except the RS-4 single family districts. The zones that allow religious institutions to operate constitute one half of the City's territory.* Appellees' home lies within four blocks of such a district. Appellees do not confront the limited choice of ceasing their conduct or incurring criminal liability. Alternatively, they may conduct the required services in suitably zoned areas, either by securing another site away from their current house or by making their home elsewhere in the city. We cannot know the exact impact upon Appellees, in terms of convenience, dollars or aesthetics, that a location change would entail. The burden imposed, through, plainly does not rise to the level óf criminal liability, loss of livelihood, or denial of a basic income sustaining public welfare benefit. In comparison to the religious infringements analyzed in previous free exercise cases the burden here stands towards the lower end of the spectrum.

*The Final Balance*

In discussing the process for reaching a final balance we noted earlier that courts are *frequently forced to undertake an ad hoc balancing* when existing free exercise doctrine does not command a specific result. (Emphasis added).

*Id.* at 738–39.

Government may regulate place and manner of religious expression as long as there is no content classification and so long as the regulation is reasonable. *Id.* [*International Society for Krishna Consciousness v. Eaves,* 601 F.2d 809] at 827 (5th Cir.1979). Admittedly, restriction of religious conduct on public streets and in airports is less burdensome than restriction of such conduct on an individual's property. The *Prince* [*v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)] and the *Krishna* cases, however, establish the principle that government can exercise its police power to limit the place and manner of religious

conduct, despite a significant burden on free exercise.

\*   \*   \*   \*   \*   \*

We glean a final bit of support for our holding from a Supreme Court dismissal for want of a substantial federal question in *Corporation of the Presiding Bishop v. City of Porterville,* 338 U.S. 805, 70 S.Ct. 78 [94 L.Ed. 487,] (1949). The state court had held that churches may be excluded from residential areas consistently with the free exercise clause. Justice Vinson, writing in a later case, *American Communications Ass'n v. Douds,* 339 U.S. 382, 397, 70 S.Ct. 674 [683] 94 L.Ed. 925 (1950), explained the Supreme Court's dismissal in the California case.

When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the nation is an absurdity. We recently dismissed for want of substantiality an appeal in which a church group contended that its First Amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas.

*Id.* at 740.

The most apparent distinction between the facts in this case and those in *Grosz* is that, unlike in *Grosz,* Jefferson County's Zoning regulations *do not* "permit organized, publicly attended religious activities in all zoning districts except [E–1] single family districts." *Id.,* at 739. Furthermore, "The Zones that allow religious institutions to operate [do not] constitute one-half of the [County's] territory." *Id.* In *Grosz,* churches did not have to seek rezoning in order to locate.

The court in *Islamic Center of Miss., Inc. v. City of Starkville, Miss.,* 840 F.2d 293 (5th Cir.1988), a case which is arguably more analogous to the instant situation, said, *inter alia,* that

... [The Fourteenth Amendment] forbid[s] government to burden the free ex-

ercise of any religion or to favor one religion over another.

The zoning ordinance of the City of Starkville, Mississippi, prohibits the use of buildings as churches in all of the areas within the city limits near the campus of the University of Mississippi *unless an exception is granted* by the City Board of Aldermen. There is no church in any part of the City in which churches are permitted as of right.

*Id.* at 294. (Emphasis added).

The City's *zoning ordinance requires final approval by the Board of Aldermen of the use of property for a church when that use requires an exception to the provisions of the ordinance.* Consequently, the Planning Commission submitted its recommendation to the Board for approval. On November 22, 1983, Shwehdi received a telephone call from a reporter who worked for a television station, informing him that the Board of Aldermen would consider the Islamic Center's request that evening and that, because of neighborhood opposition, the Board would likely reject the recommendation.

\* \* \* \* \* \*

The Board then voted unanimously to deny the exception without, so far as its minutes show, giving any reasons.

*Id.* at 296. (Emphasis added).

*Since 1969, nine churches have applied for permits, or exceptions, to allow their location in areas zoned against church use, and the Board has granted every one of the nine.*

*Id.* at 297. (Emphasis added).

The Islamic Center contends that the zoning ordinance is invalid on its face because it forces Muslims to worship in the least acceptable parts of the City or in the county outside the City's boundaries, that the City's action in denying it an exception violates its members' right to free exercise of their religion, and that the Board's action was arbitrary, thus denying it and its members due process. The City maintains that the ordinance does not inhibit the free exercise of religion because churches may be built ei-

ther in the R–E districts or outside the city limits.

\* \* \* \* \* \*

Regulatory statutes or ordinances that affect religious activity are constitutional so long as they impose no undue burden on the ability of the church or its members to carry out the observances of their faith. *The district court's opinion and the City's brief both suggest that application of the zoning ordinance to the Islamic Center places no burden on it or its members because they can establish a mosque within walking distance of the campus outside the city limits or buy cars and ride to more distant places within the City. The suggestion is reminiscent of Anatole France's comment on the majestic equality of the law that forbids all men, the rich as well as the poor, to sleep under bridges, to beg in the streets and to steal bread.* Laws that make churches, synagogues, and mosques accessible only to those affluent enough to travel by private automobile obviously burden the exercise of religion by the poor, a class that includes many students. *And a city may not escape the constitutional protection afforded against its actions by protesting that those who seek an activity it forbids may find it elsewhere.* By making a mosque relatively inaccessible within the city limits to Muslims who lack automobile transportation, the City burdens their exercise of their religion. (Emphasis added).

\* \* \* \* \* \*

Zoning is, of course, a valid exercise of a municipality's police power, and courts accord such municipal decisions considerable deference. *When, however, a community's zoning plan infringes upon first amendment rights, we scrutinize its validity more closely, and mere rationality of the plan does not suffice:* it must be narrowly drawn in furtherance of a substantial government interest. We use this more stringent standard even when a challenged regulation restricts freedom of expression only inci-

dentally or only in a small number of cases. The same precept applies to an infringement of the free exercise of religion. When *a zoning ordinance burdens religious use, "the deference normally due a legislative zoning judgment is not merited."* Indeed, the Sixth Circuit has held that, if a zoning ordinance infringes a free exercise right, the city must justify the ordinance by showing a compelling government interest. (Emphasis added).

\* \* \* \* \* \*

If government exercises its power to affect group worship, it must demonstrate at least that the burden imposed serves an important government purpose and also that this purpose could not be accompanied by a means less burdensome to the exercise of religion.

*As the Supreme Court observed in Schad, the availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits.* "[One] is not to have the exercise of his liberty of expression [and, we add, his freedom of religion] in appropriate places abridged on the plea that it may be exercised in some other place." (Emphasis added).

\* \* \* \* \* \*

Many state courts have therefore held that a zoning ordinance that prohibits the construction of church buildings or the use of all existing buildings for public worship in virtually all residential districts violates the free exercise clause. The majority of these state court decisions have held that municipalities may not completely exclude facilities for religious use from such districts, although in many of these cases there was a justification other than free exercise for the invalidation of the ordinance.

*Id.* at 298–300.

The City's approval of applications for zoning exceptions by other churches suggests that it did not treat all applicants alike. This undermines the City's contention that the Board denied a zoning exception to the Muslims solely for the purposes of traffic control and public safety.

\* \* \* \* \* \*

While lines must be drawn at some point, and, when traffic is congested, a few more cars may aggravate a bad situation, just as a final straw may break a camel's back, the City has advanced no rational basis other than neighborhood opposition to show why the exception granted all other religious centers was denied the Islamic Center. *As the Supreme Court observed in City of Cleburne v. Cleburne Living Center,* [473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)] *an equal protection case, neighbors' negative attitudes or fears, unsubstantiated by factors properly cognizable in a zoning proceeding, are not a permissible basis for treating a home for the mentally retarded differently from other group or multi-unit housing institutions.* There is even less justification for differentiating between familiar and unfamiliar religions. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."

Professor Laurie Reynolds has suggested that courts should require that ordinances requiring special use permits or exceptions for the use of property as churches contain specific, religiously neutral standards to reduce the likelihood of abuse and to require uniformity in the allocation of burdens on religious applicants. It is not necessary for us to go so far. The record makes it clear that the City did not act in a religiously neutral manner when it rejected an exception for the Islamic Center.

*Id.* at 302. (Emphasis added).

In *Lakewood, Ohio Cong. of Jehovah Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303 (6th Cir.1983) *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), the court upheld an ordinance "which prohibits construction of church buildings in virtually all residential districts in the city...." *Id.,* at p. 303. The court held that "Inconvenient economic burdens on religious freedom do not rise to a consti-

tutionally impermissible infringement of free exercise." *Id.*, at p. 306. The court noted, however, that, "The zoning ordinance does not prevent the Congregation from practicing its faith through worship whether the worship be in homes, schools, other churches or meeting halls throughout the city." *Id.*, at 307. That does not appear to be the case here. Unlike the situation in *Lakewood*, the ordinances here do not allow church construction in commercial or multi-family residential districts in the absence of a change of classification to Inst.–1. *Lakewood* primarily stands for the proposition that churches are not entitled to purchase the cheapest land. This court agrees. This court does not agree that the ability to purchase "cheaper" land should depend on neighborhood acceptance of required zoning changes under a First Amendment analysis.

The *Lakewood* court held that there had been "no infringement of a fundamental [First Amendment] right." *Id.*, at 309. The court states that "If an ordinance infringes a fundamental right, *then* it must be justified by a compelling governmental interest employed in the least restrictive means to achieve its purposes." (Emphasis in original). *Id.*, at 309. There may be a "chicken and egg" problem. If the ordinance(s) *in this case allowed* churches to be constructed in reasonable areas of zoned properties, the exclusion from residential areas would not be constitutionally infirm. Here, however, the plaintiffs were required to seek a zoning change which was then subject to neighborhood whim. That is both unduly burdensome and not the least restrictive means. The least restrictive means would be to have established zoning areas that are available to all churches or, at least, to have objective standards for making such a determination.[8] "State" concerns can be addressed by restrictive covenants or court orders containing restrictions.

A number of state court cases have held that zoning ordinances which wholly exclude churches in residential districts are unconstitutional on the basis that an absolute prohibition bears no substantial relation to the public health, safety, morals or general welfare of the community. *See State ex rel. Wenatchee Cong. of Jehovah's Witnesses v. City of Wenatchee*, 50 Wash.2d 378, 312 P.2d 195, 197 (1957) (cases cited therein). That case also states:

In any event, the Wenatchee ordinance is not one of absolute prohibition. It is a permissive ordinance. As to such ordinances, the weight of authority is to the effect that a denial of a permit must be based on valid or substantial evidence showing that granting the permit would be detrimental to the health, safety, morals, or the general welfare of the community.

*Id.*, 312 P.2d at 197.

Recognizing, as does *Grosz*, that in order to prevail in this case, the plaintiffs must generally establish that there is some burden on religious conduct,[9] that defendants' ordinance or system is not the least restric-

---

**8.** The *Lakewood* decision appears to be more favorable to defendant than does *Grosz*. Even *Lakewood* did not involve what is, effectively, a special permit situation as is present here. See also *Messiah Baptist Church v. County of Jefferson, Colo.*, 859 F.2d 820 (10th Cir.1988). There the zoning "regulations permit[ted] church use as a use by right in all but three [out of 16] residential districts." *Id.*, at pp. 823–824. Its dissenter recites language from *Schad v. Borough of Mt. Ephram*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) that "[W]hen a zoning law infringes upon a protected liberty, it must be *narrowly drawn* and must further a sufficiently substantial government interest." *Messiah*, at 828 n. 1. The dissenter also states, "[T]he Supreme Court has made clear that the grant of the authority to administer the permit system must be accompanied by adequate objective standards reasonably calculated to insure against arbitrariness, capriciousness, or subterfuge." *Id.*, at 834, *citing City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). *See also Jehovah's Witnesses Assembly Hall of Southern New Jersey v. Woolwich TP*, 220 N.J.Super. 381, 532 A.2d 276 (N.J.Super.Ct. Law Div.1987) and cases cited therein. This case was reversed by the Superior Court of New Jersey, Appellate Division at 223 N.J.Super. 55, 537 A.2d 1336 (N.J.Super.Ct.App.Div.1988). The court refers to the lower court case primarily for its cited case listing. This court has not relied on State law principles.

**9.** There is no evidence that plaintiffs' religious "beliefs" are being regulated.

tive means of accomplishing its governmental purpose, and that, on balance, the "cost" to the government of altering its activity is outweighed by the "cost" or burden to the religious interest, the court concludes that the plaintiffs have met this burden. There is no suggestion in *Grosz* that the burden on religion must be intentional or discriminatory.

It is undisputed that the primary, if not sole, policy reason for establishing the defendants' Inst.–1 system was to give it "site control," primarily with regard to what have been referred to as "state" factors. The evidence is overwhelming that no such policy concerns affected this decision. The court recognizes that the defendants are allowed to consider, in addition to "state" factors, neighborhood aesthetics. On the other hand, it is too great a burden on religious interests to allow this to be determined *ad hoc* based upon neighborhood opposition, *vel non*. If the defendants choose not to apply objective standards with regard to what is tantamount to a special permit system, its least restrictive alternative would be to provide a predetermined zoning plan which allows for churches in appropriate zones. Allowing churches to go only where they are welcome smacks of an unreasonable burden, even if the opposition is not related to the denomination of the church.

There is no substantial evidence that the denomination of plaintiffs was a motivating factor. In any event, the court cannot so find from a preponderance of the evidence. The present system lends itself to the possibility of such influences. This may be, in and of itself, a burden on religion. The court's primary conclusion is that the burden here on religion is that the ability of a church to locate or not is dependent on the acceptability of that church, or any church, to the surrounding community,[10] without there having been any predetermination

that churches are allowed to go in any area. It is not necessary for the court to determine whether the ordinance is facially invalid. It is constitutionally infirm as applied in this case.

Defendants have argued that "As the testimony at trial indicated, there are numerous tracts of land in unincorporated Jefferson County zoned A–1 (Agricultural) which could be rezoned upon proper application to Institutional usage at any time." This argument does not answer the fact that the same can be said for residential areas, and that, indeed, *many* such zoning applications have been allowed in residential areas. The burden on religion is that whether such rezonings are allowed is dependent not upon objective standards but upon the neighborhood's willingness to accept a church or, at least, its failure to oppose. That is a thin reed upon which to base the exercise of a religious freedom. The answer is to establish set aside areas applicable to all churches or to set objective standards.

This court fully recognizes that plaintiffs could likely find a place in Jefferson County which would be considered less objectionable by the defendants and the surrounding community. That fact does not eliminate the burden of neighborhood whim and possible neighborhood bias. *Zoning and the Location of Religious Establishments*, Pearlman, 31 Cath.U.L.Rev. 314 (1988), cited by defendants, notes that there are two principal lines of *state law* decisions which fall into extreme camps. The first is the "New York" or majority view that wholly excluding a church from a residential area bears no reasonable relationship to the police power. The other extreme is the "California" view, namely, that municipalities have some right to exclude churches from residential zones. Even under the latter view, the courts have considered such problems as traffic, park-

10. Cf. *Congregation Committee, North Fort Worth Cong, Jehovah's Witnesses v. City Council of Haltom City, Texas,* 287 S.W.2d 700 (Tex.Civ. App.1956). *See also Geo–Tech Reclamation Industries, Inc. v. Hamrick,* 886 F.2d 662 (4th Cir.1989) where the court considered a provision of a state Solid Waste Management Act

which allowed permits to be denied if a solid waste facility "is significantly adverse to the public sentiment of the area where the solid waste facility is or will be located." The court affirmed a trial court decision that the provision was facially violative of the due process rights under the United States Constitution.

ing and noise. The article also notes that the trend in federal courts has been to adopt a balancing test as evidenced by *Grosz*. The article states that "The court noted in *Grosz* that the Miami Beach ordinance permitted religious institutions in many other residential zones and that the ordinance has been enforced in an even-handed manner." Further, the article points out that in *Grosz*, "the religious services produced noise and crowds and that neighborhoods had complained about the *services*." (Emphasis added). The article does not significantly discuss situations, such as that here, where uses by churches are decided on the basis of special application.

The decision this court must make is not whether the plaintiffs or the neighbors are the more innocent. The dispute is between the plaintiffs and the defendants and defendants' system. If defendants would offer protection to the neighbors, they must do so in a constitutional manner. Any injury to the neighbors as a result of the invalidation of defendants' decision, while regrettable, cannot excuse a constitutional violation or forestall a constitutional remedy.[11]

The court ultimately concludes that, under the facts of this case, defendants' ordinance, and actions pursuant to and as applied under that ordinance, constitute a violation of plaintiffs' rights under the First and Fourteenth Amendments to the Constitution of the United States.[12] Under Alabama law, a Board of Zoning Adjustment can grant "variances" even to the extent of allowing a non-conforming *use*. *Swann v. Bd. of Zoning Adjustment of Jefferson County*, 459 So.2d 896, 899 (Ala.Civ.App.

1984). In order to be entitled to a variance, there must be, however, an "unnecessary hardship." This court does not perceive that such a possible remedy forecloses this action. *East–Bibb Twiggs Neighborhood Ass'n v. Macon Bibb Planning & Zoning Com'n*, 888 F.2d 1576 (11th Cir.1989), does not appear to have application. There is no evidence that a First Amendment claim has been made in any state proceeding. Compare *Nasser v. City of Homewood*, 671 F.2d 432 (11th Cir.1982).

The court calls attention to the following for possible edification. Annot., 74 ALR 2d 377 (1960) (Zoning regulations as affecting churches); *Zoning The Church: The Police Power Versus The First Amendment*, Reynolds, 64 B.U.L.Rev. 767. (See particularly discussion as to "permit" proceedings); *Land Use Regulation and the Free Exercise of Religion*, 84 Colum.L.Rev. 1562 (1984).

On or before February 15, 1990, defendants will serve on the plaintiffs provisions it wishes to be incorporated in the final Judgment, including proposed conditions with regard to rezoning. On or before February 22, 1990, plaintiffs will submit and serve a proposed final Judgment. On or before February 27, 1990, defendants will submit and serve any proposed objections to the Judgment form. Thereafter, a Judgment will be entered.[13]

---

**11.** *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570 (11th Cir.1989), would appear to have little, if any, bearing on a First Amendment analysis. While neighborhood opposition is an appropriate factor for consideration in a pure "arbitrary and capricious" context, it is not appropriate as a sole factor under a First Amendment analysis.

**12.** Plaintiff purports to make a state pendent claim pursuant to Article I, Section 3 of the Alabama Constitution. While the court doubts the application of this section, it does not reach the issue. Interestingly, the case of *Pentecostal Holiness Church of Montgomery v. Dunn*, 248

Ala. 314, 27 So.2d 561 (1946) would appear to be favorable to the plaintiffs. It, however, does not rely upon said § 3. See particularly the quote from *City Council of Montgomery v. West*, 149 Ala. 311, 42 So. 1000 (1907). That decision appears to have been premised on the Fourteenth Amendment to the Constitution of the United States. *Cf. State ex rel Roman Catholic Bishop of Reno v. Hill*, 59 Nev. 231, 90 P.2d 217 (1939).

**13.** The court is fully aware, as is suggested in Grosz, that decisions of this type are, of necessity, somewhat *ad hoc.* There may be room for

differing opinions as to the applicable law. In view of this, it may be appropriate for the parties, for the benefit of all, to suggest possible conditions of a stay if there is a contemplated appeal. It could, of course, be disastrous to plaintiffs if they proceed to build and the judgment is reversed.