**DAYTONA RESCUE MISSION, INC. & Gabriel J. Varga, individually, Plaintiffs,**

v.

**The CITY OF DAYTONA BEACH, & the City of Daytona Beach City Commission, Defendants.**

No. 94–0575–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

May 12, 1995.

Mathew D. Staver, Frederick H. Nelson, Staver & Associates, Orlando, FL, H. Robert Showers, J. Matthew Szymanski, Gammon & Grange, P.C., McLean, VA, for plaintiffs.

Marie Simone Hartman, City of Daytona Beach, Daytona Beach, FL, for defendants.

## ORDER

G. KENDALL SHARP, District Judge.

Daytona Rescue Mission, Inc. (DRM) and Gabriel J. Varga (Varga) bring this action against the City of Daytona Beach (City) and the City of Daytona Beach City Commission (Commission) pursuant to 42 U.S.C. § 1983 and the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C.A. § 2000bb–2000bb–4, seeking injunctive and declaratory relief. DRM and Varga assert that the City code violates their rights under the Establishment Clause and Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and RFRA. The City and Commission filed a motion for summary judgment. DRM and Varga responded in opposition. Subsequently, DRM and Varga filed a motion for summary judgment to which the City and the Commission responded in opposition. Based on a review of the case file and relevant law, the court grants summary judgment in favor of the City and the Commission and denies the motion for summary judgment filed by DRM and Varga.

### I. Facts

#### A. The Events

DRM is a non-profit religious corporation established and organized under the laws of the State of Florida in May 1992. DRM has federal tax exempt status as a church pursuant to the Internal Revenue Code. Varga is the founder, pastor, president and executive director of DRM. Presently, DRM is located at 910 Beville Road in Daytona Beach, Florida. At the Beville Road site, DRM provides food bags to the needy for consumption off premises. In addition, DRM regularly conducts communal worship services, provides counseling and children's services, and distributes clothing. DRM also provides meals and conducts worship services at other churches in the City and at City facilities.

Prior to founding DRM, Varga was the pastor of the Milwaukee Rescue Mission from 1978 to 1992. In April 1992, Varga met with the City's Director of Planning and Redevelopment, Gerald Langston (Langston), regarding Varga's intent to form DRM. Langston referred Varga to Saralee Lewis Morrissey (Morrissey) for assistance regarding potential sites for DRM. Between May 1992 and January 1993, Varga looked at numerous sites within the City for location of DRM. Varga pursued sites located at 800 Orange Avenue and 724 South Segrave and made offers on both properties. Although Varga's offer for the Orange Avenue location was refused, his offer for the Segrave property resulted in a contract for sale. In June 1993, Varga reached an agreement on the financing for the purchase of the Segrave site. On June 16, 1993, Varga filed an application for semi-public use for the Segrave site. (Doc. 34, Ex. 2.) On the application, the requested use was listed as "Church–Mission" in an area zoned M–1. DRM and Varga represented their proposed use of the Segrave site as a facility for worship services, daily housing of a limited number of homeless men, and daily feeding of homeless men including those who would not be sheltered at the facility.

The City Planning Board heard Varga's application for semi-public use at its July 22, 1993 meeting. At the meeting, Morrissey made a report to the Planning Board and identified the Segrave site as a vacant warehouse building and parking area. According to the meeting minutes, Morrissey stated that the warehouse building fronts on Segrave and is zoned M–1 (Local Industry) while the parking area fronts on Clark Street and is zoned R–3. In addition, the site was described as located in a mixed use area. Nearby property was described as being zoned T–2 (Tourist Accommodations and Offices), R–3, and BA (Business Automotive) with certain areas undeveloped and other areas developed as single and multi-family residential. Morrissey indicated that churches are permitted uses in both the M–1 and R–3 zoning districts but that the Land Development Code (LDC) provided that homeless shelters and food bank programs are not considered accessory uses. After

hearing the applicant's presentation and comments by citizens, the Planning Board continued the matter until its August meeting. On August 26, 1993, the Planning Board heard the request and denied the application for semi-public use by a vote of seven to two. Subsequently, the matter went before the Commission on October 20, 1993. The Commission voted unanimously to deny the request for semi-public use. The October 20 Commission action was the final administrative action on the application for semi-public use.

## B. The Zoning Regulations

The City adopted the LDC on May 5, 1993. (Doc. 34, Ex. 9.) Prior to the adoption of the LDC, land development was regulated by zoning ordinance 78–400. Under zoning ordinance 78–400, the City defined "Church and Religious Institutions" as "[a] building or set of buildings used for the sole purpose of worship and customarily related activities." (Doc. 34, Ex. 4.) In adopting the LDC, the following sentence was added to the definition of Church or Religious Institution: "Homeless shelters and food banks are not customarily related activities." The LDC provides that Churches and Religious Institutions shall be permitted as conditional uses in certain areas, including areas zoned R–3, BA, T and M–1 district and as a special use in any district subject to certain criteria. (Doc. 34, Ex. 9 at Article 17, Section 2.)

The LDC outlines the procedures and criteria for approval of public and semi-public uses in Article 4, sections 5 and 6. Section 5.3 provides that public or semi-public uses shall be approved upon findings that the use is necessary and the criteria provided for special uses in section 6.3 have been met. Some of the criteria include the following:

(a) The use shall be consistent with the Comprehensive Plan.

(b) The establishment, maintenance, or operation of the use shall not be detrimental to or endanger the public health, safety, or general welfare.

(c) The use shall not impede the normal and orderly development and improvement of surrounding properties for uses permit-

ted in the district, and shall be consistent with the character of the immediate neighborhood.

(Doc. 34, Ex. 9 at Article 4—Page 8.)

## II. Legal Discussion

### A. Standard for Summary Judgment

■ Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. The moving party bears the burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The moving party may rely solely on his pleadings to satisfy this burden. Celotex, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; Fed.R.Civ.P. 56(c). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### B. Free Exercise of Religion

The City and the Commission assert that the court should apply the three-part test enunciated in Grosz v. City of Miami Beach, Fla., 721 F.2d 729 (11th Cir.1983), cert. denied, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984), and recently applied in First Assembly of God of Naples, Fla., Inc. v. Collier Co., Fla., 20 F.3d 419 (11th Cir.), opinion modified on denial of reh'g, 27 F.3d 526 (11th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 730, 130 L.Ed.2d 634 (1995), to determine whether a violation of the Free Exercise Clause exists. In applying the Grosz test, the City and the Commission argue that the code meets constitutional requirements. In opposition, DRM and Varga maintain that the City code violates their rights under the Free Exercise Clause.

First Assembly is a case in which a church converted a building on its property into a homeless shelter. First Assembly, 20 F.3d at 420. The property was zoned multi-family residential which permitted churches and their "customary accessory uses." Id. A county official charged that First Assembly's homeless shelter violated several zoning ordinances. Id. The Code Enforcement Board (CEB) held numerous hearings on the matter and determined that the shelter was not a "customary accessory use" of the church property and that the zoning and housing codes precluded the housing of the large number of people at the shelter. Id. Plaintiffs sued alleging that the zoning ordinances violated their First Amendment right to free exercise of religion and sought a temporary restraining order (TRO) as well as preliminary and permanent injunctive relief. Id. at 420–21. The lower court denied the request for TRO and preliminary injunction. Id. Subsequently, the lower court granted summary judgment in favor of the county.

The Eleventh Circuit affirmed the lower court's grant of summary judgment stating that imposition of the zoning laws did not violate First Assembly's free exercise rights. Id. at 424. In its decision, the Eleventh Circuit referred to the Supreme Court's decision in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), with re-

gard to analyzing laws challenged under the Free Exercise Clause. *Id.* at 423 (noting that "the Supreme Court explained that 'a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.' ") In addition, the Eleventh Circuit applied the *Grosz* three-part test. *Id.* at 424. (stating that (1) the government regulation must regulate religious conduct, not belief; (2) the law must have a secular purpose and secular effect; and (3) once these threshold tests are met, the court balances the competing governmental and religious interests). The court held that the ordinances at issue passed the threshold tests under the Supreme Court's Free Exercise Clause analysis and the *Grosz* test. *Id.* Subsequently, the Eleventh Circuit modified its opinion stating that "the Religious Freedom Restoration Act of 1993 may apply to this case. However, since it was not raised by either party, we decline to discuss it." *First Assembly,* 27 F.3d at 526 (citation omitted).

▪ The court notes that RFRA has been held retroactive. *See Lawson v. Dugger,* 844 F.Supp. 1538, 1542 (S.D.Fla.1994). Because the Eleventh Circuit applied both the Supreme Court analysis and the *Grosz* three-part test in its opinion in *First Assembly,* this court will apply both analyses to determine whether the City's code violates the Free Exercise Clause. In addition, the court will discuss RFRA *infra* part II.C.

▪ The court will begin with the Supreme Court analysis. DRM and Varga take issue with the definition of Church or Religious Institution in that it excludes homeless shelters and food banks as customarily related activities. Thus, an entity seeking to establish a homeless shelter or food bank must meet the zoning requirements for that particular use in the particular zoning district regardless of whether the entity is a church or religious institution. As such, the court finds that the City code is neutral and of general applicability. The court notes that DRM and Varga's complaint emphasizes that the definition of church was changed while DRM and Varga sought approval for the Segrave site. However, the evidence shows that although the sentence pertaining to homeless shelters and food banks was added to the definition of Church or Religious Institution, this additional sentence put in writing an established policy. (Doc. 40 at 10–11) Further, Varga's affidavit states that as of his meeting with Langston in 1992, Langston had indicated that DRM would have to be treated as a special use. (Doc. 34, Ex. 42, Dfts.' Ex. 1.)

As to the *Grosz* three-part test, the court finds that the City code regulates conduct, not religious belief. *See First Assembly of God of Naples, Fla., Inc. v. Collier Co., Fla.,* 775 F.Supp. 383, 386 (M.D.Fla.1991) (applying *Grosz* in an order denying motion for preliminary injunction; and stating that the zoning ordinance as applied regulated housing the homeless on church property and not the belief in doing so); *Grosz,* 721 F.2d at 733 (noting that the Constitution does not prohibit absolutely government regulation of religious conduct). In addition, the court finds that the code has a secular purpose and effect. The record fails to show that the code is aimed at impeding religion, that it is based on a disagreement of religious beliefs or practices, or that it negatively influences the pursuit of religious activity or expression of religious belief. *See Grosz,* 721 F.2d at 733–34.

Because the code passes the threshold tests of *Grosz,* the court compares the burden on the City of altering its activity with the burden on religion requiring DRM and Varga's compliance with the City code. In applying the balancing test, the court notes that the lower court in *First Assembly* recognized as a significant interest the preservation of a government's ability to regulate zoning. *See First Assembly,* 775 F.Supp. at 386. Further, the lower court found that imposition of a religious based exception would prevent enforcement of the zoning code and permit any non-conforming use of property if a religious interest was asserted. *Id.* at 387. Although DRM and Varga argue that housing the homeless and feeding the poor are central to their religion, the court finds that the burden on religion is at the lower end of the spectrum. *See First As-*

*sembly,* 20 F.3d at 424 (stating that the burden on First Assembly to either conform its shelter to the zoning laws, or to move the shelter to an appropriately zoned area, is less than the burden were it to be forced to allowing the zoning violation). The record in this case shows that other facilities exist within the City which house the homeless. (Doc. 34, Ex. 3.) In addition, the record shows that DRM and Varga pursued only two sites and sought an application for semi-public use for only one site. Accordingly, the court finds that in applying the *Grosz* test, the City code does not violate DRM and Varga's right to the free exercise of religion.

The court notes that DRM and Varga attempt to distinguish the *First Assembly* case stating that the district court found that the plaintiffs had not indicated the significance of the practice of housing the homeless to their religion and that there was no indication that the zoning enforcement procedures were based on subjective considerations or neighborhood pressure. DRM and Varga assert that they have presented evidence indicating that feeding the homeless is central to their faith and that the decision not to grant the application for semi-public use was based on public whim. *See Church of Jesus Christ of Latter-Day Saints v. Jefferson Co.,* 741 F.Supp. 1522, 1534 (N.D.Ala.1990) (finding the evidence overwhelming that state factors were not considered in zoning decision; and stating that to allow churches to go only where they are welcome is an unreasonable burden). However, the court is not persuaded that *First Assembly* is distinguishable. In affirming the grant of summary judgment in favor of the county, the Eleventh Circuit opinion assumed without deciding that sheltering the homeless was central to plaintiffs' religion. Further, in the instant case, the record indicates that a number of issues were raised at the hearings on the application for semi-public use, including security. (Doc. 34, Ex. 8, August 26, 1993 Planning Board Meeting and October 20, 1993 City Commission Meeting.) In fact, at the October 20 meeting, Varga noted that the Planning Board members were concerned about the issue of safety and security. (Doc. 34, Ex. 8, October 20 City Commission Meeting.)

## C. RFRA

In November of 1993, Congress enacted RFRA. As stated in the statute, the purpose of RFRA is to restore the compelling interest test, as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in cases where the free exercise of religion is substantially burdened. *See* 42 U.S.C. § 2000bb(b)(1). In particular, the statute notes that "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion" in its decision in *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *See* § 2000bb(a)(4). Section 2000bb-1 provides in pertinent part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000bb-1(a), (b).

Thus, DRM and Varga must show that their constitutional rights have been substantially burdened. A recent case in the Middle District of Florida quoted the Ninth Circuit regarding a plaintiff's burden in a free exercise claim:

[t]o show a free exercise violation, the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in

conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial.... *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1393 (9th Cir.1994), quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–1 (9th Cir.1987), *aff'd sub. nom. Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2140, 104 L.Ed.2d 766 (1989).

*Dickerson v. Stuart,* 877 F.Supp. 1556 (M.D.Fla.1995).

█ The City and the Commission assert that the City Code does not prevent or seriously inhibit DRM or Varga's ability to provide housing or food. In opposition, DRM and Varga argue that their exercise of religion is substantially burdened because its church is not permitted anywhere within the City without first receiving approval, and thus, it is denied the opportunity to locate anywhere within the City. The court finds that the City code does not substantially burden DRM and Varga's free exercise of religion. *But see Western Presbyterian Church v. Board of Zoning Adjustment,* 862 F.Supp. 538, 545–46 (D.D.C.1994) (holding that to regulate religious conduct through zoning laws is a substantial burden on the free exercise of religion). Although denial of the application for semi-public use prevents DRM and Varga from running a homeless shelter and food program from the Segrave site, DRM and Varga fail to show that the City code prevents them from engaging in such conduct anywhere in Daytona Beach. As noted above, the City and the Commission present evidence that other homeless shelters exist within the City and that DRM and Varga pursued only two sites and applied for semi-public use at only one site.

Even assuming that DRM and Varga have shown a substantial burden on their free exercise of religion, the City and Commission argue that enacting and enforcing fair and reasonable regulations throughout its jurisdiction is a compelling interest and that regulating a homeless shelter providing daily shelter and feeding furthers zoning interests. In addition, the City and the Commission maintain that the regulations are the least restrictive means to further such interest.

DRM and Varga assert that the City and the Commission fail to show that the City code meets a compelling interest or that it is the least restrictive means to further that interest.

The court finds that the City's interest in regulating homeless shelters and food banks is a compelling interest and that code furthers that interest in the least restrictive means. *Cf. First Assembly,* 775 F.Supp. at 386 (recognizing the preservation of government's ability to regulate zoning as a significant interest). The effect of the definition of Church or Religious Institution excluding homeless shelters and food banks as customarily related activities requires a church or religious institution to meet the applicable zoning requirements in the same manner as any other person or entity seeking to establish a homeless shelter or food bank. With regard to the denial of the application for semi-public use, the court notes that the facts in this case evidence that a number of issues were raised at the hearings on the application for semi-public use, including safety and security. Accordingly, the court finds the City code constitutional under RFRA.

### D. Establishment Clause

█ DRM and Varga assert that the code violates the Establishment Clause because it defines "church" in a manner which favors a traditional church. The City and the Commission argue that the Establishment Clause may be violated if the relief sought is obtained. The court finds that plaintiffs' claim that the code violates the Establishment Clause is merely a repackaging of the free exercise count to fit another constitutional label. *See Brown v. Borough of Mahaffey, Pa.,* 35 F.3d 846, 850 (3d Cir.1994) (finding that although plaintiffs claimed that hostility displayed and obstacles imposed on their own religious exercise translated into favoritism to all other religions, such logic would transform every viable free exercise action into an Establishment Clause claim).

### E. Equal Protection

Count III of the complaint asserts that the code as written and as applied substantially burdens DRM and Varga's constitutional

rights in an arbitrary and capricious manner because the code discriminates among religion by defining church. DRM and Varga allege that the code burdens churches with homeless ministries and that the City and the Commission are not uniformly enforcing zoning regulations but instead are targeting DRM and Varga. The City and the Commission seek summary judgment on this count as well.

■ "[T]o maintain an equal protection claim with any significance independent of the free exercise count which has already been raised, [DRM and Varga] must also allege and prove that they received different treatment from other similarly situated individuals or groups." *See Brown*, 35 F.3d at 850. The record lacks evidence that DRM and Varga were treated differently from similarly situated persons. Further, the court finds that the equal protection count is an another attempt by DRM and Varga to recharacterize their free exercise claim.

### III. Conclusion

No genuine issues of material fact exist which would preclude granting summary judgment in favor of the City and the Commission. The court finds that under Supreme Court analysis, the *Grosz* test, and RFRA, the City code meets constitutional requirements with regard to the Free Exercise Clause. In addition, the court finds that the City code does not violate the Establishment Clause or the Equal Protection Clause. Because the court finds that the City code does not violate constitutional rights, either facially or as applied to DRM and Varga, the court GRANTS the City and the Commission's motion for summary judgment. (Doc. 34.) Therefore, the court DENIES the motion for summary judgment filed by DRM and Varga. (Doc. 43.) The court directs the clerk of the court to enter judgment accordingly.

It is **SO ORDERED.**